# SUPREME COURT OF THE UNITED STATES

_____

No. 23A763

_____

## RAUL LABRADOR, ATTORNEY GENERAL OF IDAHO *v.* PAM POE, BY AND THROUGH HER PARENTS AND NEXT FRIENDS, PENNY AND PETER POE, ET AL.

ON APPLICATION FOR STAY

[April 15, 2024]

The application for stay presented to JUSTICE KAGAN and by her referred to the Court is granted. The December 26, 2023 order of the United States District Court for the District of Idaho, case No. 1:23-cv-269, is stayed, except as to the provision to the plaintiffs of the treatments they sought below, pending the disposition of the appeal in the United States Court of Appeals for the Ninth Circuit and disposition of a petition for a writ of certiorari, if such a writ is timely sought. Should certiorari be denied, this stay shall terminate automatically. In the event certiorari is granted, the stay shall terminate upon the sending down of the judgment of this Court.

JUSTICE KAGAN would deny the application for stay.

JUSTICE GORSUCH, with whom JUSTICE THOMAS and JUSTICE ALITO join, concurring in the grant of stay.

Early in the litigation below, the district court issued a preliminary injunction. Ordinarily, injunctions like these may go no further than necessary to provide interim relief to the parties. In this case, however, the district court went much further, prohibiting a State from enforcing any aspect of its duly enacted law against anyone. Today, the Court stays the district court's injunction to the extent it applies to nonparties, which is to say to the extent it provides "universal" relief. That is a welcome development.

I

To appreciate the significance of the Court's ruling, some background helps. In 2023, Idaho adopted the Vulnerable Child Protection Act. The law sought to regulate a number of "'practices upon a child for the purpose of attempting to alter the . . . child's sex.'" ___ F. Supp. 3d ___, ___ (Idaho 2023), App. A to Application for Stay 5. Those practices range from "surgeries that sterilize or mutilate" a child's genitals to the supply of "[p]uberty-blocking medication." *Ibid.* Idaho claimed that its law aimed to protect children from treatments that can cause "lasting harm and irreversible damage." *Id.*, at 51 (internal quotation marks omitted). The law's provisions were scheduled to take effect January 1, 2024.

Before that could happen, two children and their parents sued Idaho's attorney general and a local prosecutor in federal district court. The children and their parents alleged that, without access to puberty blockers and estrogen, the two minor plaintiffs would likely suffer serious mental health problems. Decl. of P. Poe in No. 1:23–cv–269 (D Idaho), ECF Doc. 32–2, ¶¶14, 19, 22; Decl. of J. Doe, ECF Doc. 32–4, ¶¶14, 16, 23–24. Shortly after filing suit, the plaintiffs asked the district court to issue a preliminary injunction.

The district court agreed to do so. But instead of enjoining state officials from enforcing the law with respect to the plaintiffs and the drug treatments they sought, the district court entered a universal injunction. App. A to Application for Stay 52–54. That is, the court prohibited the defendants from enforcing "any provision" of the law under any circumstances during the life of the parties' litigation. *Id.*, at 54. Among other things, this meant Idaho could not enforce its prohibition against surgeries to remove or alter children's genitals, even though no party before the court had sought access to those surgeries or demonstrated that Idaho's prohibition of them offended federal law. The court's order

promised to suspend Idaho's law indefinitely, too, as this litigation (like many today) may take years to reach final judgment.

Idaho responded by appealing the district court's preliminary injunction decision to the Ninth Circuit. The State also asked the Ninth Circuit to stay the preliminary injunction during the pendency of the appeal. At the least, the State argued, the court of appeals should stay the universal aspect of the district court's injunction so that at least some portions of its duly enacted law might finally take effect.

After the Ninth Circuit denied Idaho's stay request in a brief unreasoned order, the State proceeded here. Before us, the State does not challenge the preliminary injunction to the extent it ensures the two minor plaintiffs in this case continued access to their drug treatments. That aspect of the district court's order will remain in place pending appeal. The State asks us to stay the preliminary injunction only to the extent it bars Idaho from enforcing any aspect of its law against any person anywhere in the State.

## II

Stay motions and other requests for interlocutory relief are nothing new or particularly remarkable. In truth, they are perhaps "as old as the judicial system of the [N]ation." *Scripps-Howard Radio, Inc.* v. *FCC*, 316 U. S. 4, 17 (1942). Every federal court in this country has within its "traditional" toolkit the power to pause temporarily its own order or one of a lower court or issue other forms of interim relief. *Id.*, at 9; see 28 U. S. C. §1651(a); this Court's Rule 23.1; Fed. Rule App. Proc. 8(a). Often, judges at all levels of the federal judiciary resolve motions for interlocutory relief in brief orders like the one the Court issues today and the Ninth Circuit did below. Judges have proceeded this way throughout the Nation's history. Indeed, many courts could not efficiently manage their dockets otherwise. Cf. *Wilson*

v. *Sellers*, 584 U. S. 122, 139 (2018) (GORSUCH, J., dissenting) ("[A] busy appellate court may sometimes not see the profit in devoting its limited resources to explaining the error [or] alternative basis for affirming . . . so it issues a summary affirmance instead").

Just as familiar are the rules that govern stay applications. This Court, like every other federal court, is "guided" by the same "sound . . . principles." *Nken* v. *Holder*, 556 U. S. 418, 434 (2009) (internal quotation marks omitted); see *Trump* v. *International Refugee Assistance Project*, 582 U. S. 571, 580 (2017) (*per curiam*); *id.*, at 584 (THOMAS, J., concurring in part and dissenting in part). We ask (1) whether the stay applicant has made a strong showing that it is likely to succeed on the merits, (2) whether it will suffer irreparable injury without a stay, (3) whether the stay will substantially injure other parties interested in the proceedings, and (4) where the public interest lies. *Nken*, 556 U. S., at 434. A court's """"discretion"""" to enter a stay is thus not left up to its mere """"inclination, but to its judgment"""" regarding each of these time-tested considerations. *Ibid.* (quoting *Martin* v. *Franklin Capital Corp.*, 546 U. S. 132, 139 (2005), in turn quoting *United States* v. *Burr*, 25 F. Cas. 30, 35 (No. 14,692d) (CC Va. 1807) (Marshall, C. J.)).

Applying that traditional stay test here yields a ready answer. Start with the first question: whether Idaho has shown it is likely to succeed on the merits. This Court has long held that a federal court's authority to fashion equitable relief is ordinarily constrained by the rules of equity known "'at the time of the separation of'" this country from Great Britain. *Grupo Mexicano de Desarrollo, S. A.* v. *Alliance Bond Fund, Inc.*, 527 U. S. 308, 318 (1999); see *Guaranty Trust Co.* v. *New York*, 326 U. S. 99, 105 (1945); *Boyle* v. *Zacharie & Turner*, 6 Pet. 648, 658 (1832). Under those rules, this Court has said, a federal court may not issue an equitable remedy "more burdensome to the defendant than necessary to [redress]" the plaintiff's injuries. *Califano* v.

*Yamasaki*, 442 U. S. 682, 702 (1979); see *Gill* v. *Whitford*, 585 U. S. 48, 68 (2018) ("[A] 'remedy must . . . be limited to the inadequacy that produced the injury in fact that the plaintiff has established'"); *Rhode Island* v. *Massachusetts*, 12 Pet. 657, 718 (1838); *Department of Homeland Security* v. *New York*, 589 U. S. \_\_\_, \_\_\_ (2020) (*DHS*) (GORSUCH, J., concurring in grant of stay) (slip op., at 3); *United States* v. *Texas*, 599 U. S. 670, 693 (2023) (GORSUCH, J., concurring in judgment); S. Bray, Multiple Chancellors: Reforming the National Injunction, 131 Harv. L. Rev. 417, 425–428 (2017).

The district court's universal injunction defied these foundational principles. It did not just vindicate the plaintiffs' access to the drug treatments they sought. It purported to bar the enforcement of "any provision" of the law against anyone. App. A to Application for Stay 54. The district court issued this sweeping relief even though, by its own admission, the plaintiffs had failed to "engage" with other provisions of Idaho's law that don't presently affect them—including the law's provisions prohibiting the surgical removal of children's genitals. *Id.*, at 52. In choosing such an extraordinary remedy, the district court clearly strayed from equity's traditional bounds.

The remaining stay factors—the relative harms to the parties and the public interest—point to the same conclusion. Members of this Court have long held that, "'[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *Maryland* v. *King*, 567 U. S. 1301, 1303 (2012) (ROBERTS, C. J., in chambers) (quoting *New Motor Vehicle Bd. of Cal.* v. *Orrin W. Fox Co.*, 434 U. S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). Likewise, this Court has held that "[t]here is always a public interest in prompt execution" of the law, absent a showing of its unconstitutionality. *Nken*, 556 U. S., at 436.

Both considerations favor Idaho. The district court purported to bar the State from bringing into effect portions of

a statute that no party has shown, and no court has held,
likely offensive to federal law. The district court's order
promised to run for the life of this lawsuit, thus preventing
Idaho from executing any aspect of its law for years. Mean-
while, the plaintiffs face no harm from the partial stay the
State requests. Even with it, the district court's prelimi-
nary injunction will operate to prevent state authorities
from taking any action to interfere with their ability to ac-
cess the particular drug treatments they seek.

## III

The dissent disputes none of this. It does not question
that Idaho is entitled to relief under this Court's traditional
stay test. Instead, it laments the number of requests for
interim relief this Court has recently faced in "high-profile"
cases. *Post*, at 1 (JACKSON, J., dissenting from the grant of
stay). To deter future applications of that sort, the dissent
proposes adding to our traditional stay test new factors al-
ien to our precedents and historic equitable practice. Re-
spectfully, however, the dissent's proposals miss the mark.

*First*, the dissent suggests that we should refuse to inter-
vene when both a district court and a court of appeals have
refused a party's request for interim relief. *Post*, at 2. But
the dissent does not explain how this system of upside-down
precedent works, where the Supreme Court is somehow
bound to follow lower court decisions. Of course, no one
questions that the Court should (as it does) afford due re-
spect to the work of our lower court colleagues. See, *e.g.,
Little* v. *Reclaim Idaho*, 591 U. S. \_\_\_, \_\_\_ (2020) (ROBERTS,
C. J., concurring in grant of stay) (slip op., at 5). But the
dissent does not explain why due respect should be replaced
with abject deference, or how the rule it proposes would al-
low us to discharge faithfully our own obligation to assess
fairly and independently the cases that come to us. Nor, for
that matter, does the dissent attempt to reconcile its pro-
posed new rule with the fact that, over the last 12 months,

this Court has (repeatedly) granted interim relief to the federal government in the face of contrary lower court rulings.[1]

Perhaps sensing these problems and convinced of the correctness of this Court's recent interventions, the dissent ultimately fashions itself an escape hatch. Tucked away in a footnote, the dissent adds that it does not mean to suggest that the "burden" of overcoming adverse lower court decisions "can never be carried." *Post*, at 3, n. 1. But if that's true, when does the dissent believe we should intervene, and when not? And why was it appropriate for this Court to override lower court decisions in so many other recent cases but it is inappropriate to do the same here? The dissent never says. So much for the added clarity and "restraint" it hopes to bring to our law. *Post*, at 7.

*Second*, the dissent suggests that, before granting relief, we should ask whether a case is "certworthy." *Post*, at 4. But it isn't clear how that would help matters either. In the past, various individual Justices faced with requests for interlocutory relief in chambers, sometimes while the Court stood in recess, considered whether four Justices would likely agree to take up the dispute. That practice may be understandable. But when hearing many stay requests, this one included, we sit as a full Court. And here, a majority has decided that this case is worthy of the Court's attention.

It has done so, too, for good reason. This case poses a question about the propriety of universal injunctive relief— a question of great significance that has been in need of the

---

[1] See, *e.g.*, *Murthy* v. *Missouri*, 601 U. S. \_\_\_ (2023) (overriding a lower court order prohibiting the government from coercing or encouraging social media companies to censor private speech); *Garland* v. *Blackhawk Mfg. Group, Inc.*, 601 U. S. \_\_\_ (2023) (setting aside a lower court order prohibiting the government from enforcing its regulation restricting the sale of ghost guns); *FDA* v. *Alliance for Hippocratic Medicine*, 598 U. S. \_\_\_ (2023) (countermanding a lower court order staying the Food and Drug Administration's approval of mifepristone, an abortion drug).

Court's attention for some time. *DHS*, 589 U. S., at ___ (opinion of GORSUCH, J.) (slip op., at 3); *Griffin* v. *HM Florida-ORL, LLC*, 601 U. S. ___, ___ (2023) (statement of KAVANAUGH, J.) (slip op., at 3). This case also implicates an apparent circuit split, as courts of appeals have disagreed about whether district courts may issue the sort of sweeping relief the district court issued here when faced with laws very much like Idaho's. See, *e.g.*, *Brandt* v. *Rutledge*, 47 F. 4th 661, 672 (CA8 2022); *L. W.* v. *Skrmetti*, 83 F. 4th 460, 489–490 (CA6 2023). Even applying the dissent's proposed standard for relief, then, this case would seem to satisfy it.[2]

*Third*, the dissent suggests that the Court should exercise more "caution" and "restraint" in cases like this one, where a party does not challenge the entry of a preliminary injunction but asks us to address only the scope of the remedy it provides. *Post*, at 2, 4–5. But if "caution" and "restraint" are our watchwords, why would a party's request

_____

[2] The dissent seeks to downplay the "certworthiness" of this case by recasting the universal aspect of the district court's order as an "incidenta[l]" feature designed to protect the plaintiffs' anonymity. See *post*, at 3, n. 2, 4, and n. 3. But labeling universal relief incidental does not make it so. The district court faced two plaintiffs seeking access to certain specific treatments, yet it issued an order applicable to all potential nonparties and all regulated treatments. There was nothing incidental about it. Tellingly, too, the district court nowhere paused to address the adequacy of less intrusive (and truly incidental) measures to protect the plaintiffs' anonymity—for example, a sealed order, shared with pertinent state authorities and the plaintiffs' physicians, guaranteeing them access to the particular treatments they seek. Today, the Court supplies a much-needed reminder that courts cannot so easily sidestep the traditional equitable rule that the relief a federal court may issue "must . . . be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Gill* v. *Whitford*, 585 U. S. 48, 68 (2018) (internal quotation marks omitted). In doing so, the Court does not, as the dissent suggests, "ignor[e]" the district court's reason for granting universal relief. *Post,* at 4, n. 3. Rather, the Court recognizes that "aspect of the District Court's decision" for what it is—an unpersuasive departure from our precedents. *Ibid.*

for narrower rather than broader relief "counsel against our intervention"? *Post*, at 2. Do we really want to incentivize parties to seek more sweeping relief in order to enhance their chances of success in this Court? And how does it serve "caution" and "restraint" for this Court to allow lower courts to transgress foundational remedial principles more readily than foundational liability principles? Especially when pursuing that course would mean (as it does here) that a single federal judge may erroneously suspend the operation of a law adopted by the people's elected representatives for years on end? Once more, the dissent offers no answers.

*Fourth*, the dissent contends that we should exercise special "caution" when considering whether to intervene in "high-profile cases." *Post*, at 1. But by any measure, a great deal of caution is already baked into the *Nken* analysis. To warrant this Court's intervention, an applicant seeking a stay must make a "'strong showing'" on the merits, demonstrate an "'irreparable'" harm, and persuade the Court that the public interest warrants intervention. *Nken*, 556 U. S., at 434. The dissent does not explain why these traditional cautionary notes are insufficient.

Nor does it explain why we should reserve an added new measure of caution for "high profile" matters alone. I would have thought that, as judges, we should neither deliberately seek out nor evade "high-profile" disputes, but afford all litigants who come before us their lawful due. Even taking the dissent's test on its own terms, too, my colleagues fail to explain why this case qualifies for special caution as "high profile" but so many others in the last 12 months did not. Does anyone really think that this Court's recent interventions—in cases involving ghost guns, allegations of government censorship, and abortion access—were war-

ranted because the laws at issue there were less "high-pro-file" than Idaho's? See n. 1, *supra*.[3]

## IV

None of this is to suggest the dissent is without a point. Perhaps the Court has seen a rise in the number of applications for interim relief. But if so, it seems to me that this trend is not the result of (nor does it justify tinkering with) this Court's precedents and traditional equitable standards. Instead, at least part of the problem may be attributable to a *departure* from those precedents and standards in the lower courts. In recent years, certain district courts across the country have not contented themselves with issuing equitable orders that redress the injuries of the plaintiffs before them, but have sought instead to govern an entire State or even the whole Nation from their courtrooms. Today, Idaho is on the receiving end of one of these universal injunctions, but lately it has often been the federal government.[4]

---

[3] The dissent chides me for neglecting to mention that the State stamped the word "EMERGENCY" on the front cover of its stay application. *Post*, at 5. But it is not obvious what point the dissent is trying to make. *Post*, at 6, n. 4. In its recent stay applications, the federal government hasn't always affixed a similar stamp on its papers. See, *e.g.*, Application in No. 23A302, *Garland* v. *Blackhawk Mfg. Group, Inc.* (Oct. 5, 2023); Application in No. 23A243, *Murthy* v. *Missouri* (Sept. 14, 2023); Application in No. 22A902, *FDA* v. *Alliance for Hippocratic Medicine* (Apr. 14, 2023). Should we have denied those applications on that basis? In truth, every applicant for interim relief believes its case qualifies as an "emergency." Our traditional stay test helps us evaluate those assertions by focusing our attention on factors such as irreparable harm, the balance of equities, and the public interest. The dissent does not explain what additional value an "emergency" test would provide or what neutral principle would guide our analysis. Nor, for that matter, does the dissent square its proposed new "emergency" test with its other proposals. Take the dissent's preference for avoiding high-profile cases. See *post*, at 1, 5. Does the dissent mean to suggest that we should grant relief only in "emergencies," but only so long as they also keep a low profile?

[4] Many of this Court's recent orders granting interim relief were the

GORSUCH, J., concurring

As best I can tell, universal injunctions are a relatively new phenomenon. By some accounts, universal injunctions against the federal government during President Franklin D. Roosevelt's tenure—those 12 eventful years covering the Great Depression, the New Deal, and most of World War II—were virtually unknown. See Bray, 131 Harv. L. Rev., at 434–435. Others have pointed to a single example of a "nation-wide" decree during that period, but there the Court *reversed* the lower court's "sweeping" ruling for lack of standing. *Perkins* v. *Lukens Steel Co.*, 310 U. S. 113, 117, 120–121 (1940). Even as late as President Barack Obama's administration, some estimate that lower courts issued only about 19 universal injunctions against the federal government over the course of eight years. See Dept. of Justice, J. Rosen, Opening Remarks at Forum on Nationwide Injunctions and Federal Regulatory Programs (Feb. 12, 2020). Since then, however, universal injunctions have proliferated. By one count, lower courts issued 55 universal injunctions during the first three years of President Donald Trump's administration. *Ibid.* And if the last 12 months are any indication, it seems that trend has continued apace during the administration of President Joseph R. Biden, Jr. See, *e.g.*, n. 1, *supra* (citing examples).

A rising number of universal injunctions virtually guarantees that a rising number of "high-profile" cases will find their way to this Court. Just consider this case. Idaho does not challenge the district court's injunction to the extent it addresses the plaintiffs' asserted injuries. The State seeks relief here only because and to the extent the district court prevented it from enforcing any aspect of its duly enacted

---

product of a different and unrelated problem: the profound "intrusions on civil liberties" governments attempted in response to COVID–19. *Arizona* v. *Mayorkas*, 598 U. S. \_\_\_, \_\_\_ (2023) (statement of GORSUCH, J.) (slip op., at 4). And, "[n]ot surprisingly," the number of requests for interim relief in this Court "has shrunk in the years since COVID–19." *Post*, at 11, n. 5 (KAVANAUGH, J., concurring in the grant of stay).

law against anyone—all without any showing that other provisions in the statute violate federal law or the rights of any current party. As in so many other recent cases, the district court's universal injunction effectively transformed a limited dispute between a small number of parties focused on one feature of a law into a far more consequential referendum on the law's every provision as applied to anyone.

What's worse, universal injunction practice is almost by design a fast and furious business. Normally, parties spend "their time methodically developing arguments and evidence" before proceeding to a trial and final judgment limited to the persons and claims at hand. *DHS*, 589 U. S., at ___ (opinion of GORSUCH, J.) (slip op., at 3). If they seek relief for a larger group of persons, they must join those individuals to the suit or win class certification. In universal-injunction practice, none of that is necessary. Just do a little forum shopping for a willing judge and, at the outset of the case, you can win a decree barring the enforcement of a duly enacted law against anyone. Once that happens, the affected government (state or federal) will often understandably feel bound to seek immediate relief from one court and then the next, with the finish line in this Court. After all, if the government does not act promptly, it can expect a law that the people's elected representatives have adopted as necessary and appropriate to their present circumstances will remain ineffectual for years on end. In all these ways, universal injunctions circumvent normal judicial processes and "tend to force judges into making rushed, high-stakes, low-information decisions" at all levels. *Id.*, at ___ (opinion of GORSUCH, J.) (slip op., at 4).

Today, the Court takes a significant step toward addressing the problem. It does so not by reworking our precedents and traditional equitable practices, but by enforcing them. It focuses directly on a root cause of the recent proliferation of interlocutory litigation in "high profile" matters, sets

aside a district court's universal injunction, and in the process reminds lower courts of the foundational rule that any equitable remedy they issue must not be "more burdensome to the defendant than necessary to [redress]" the plaintiff's injuries. *Califano*, 442 U. S., at 702.

Lower courts would be wise to take heed. Retiring the universal injunction may not be the answer to everything that ails us. But it will lead federal courts to become a little truer to the historic limits of their office; promote more carefully reasoned judicial decisions attuned to the facts, parties, and claims at hand; allow for the gradual accretion of thoughtful precedent at the circuit level; and reduce the pressure on governments to seek interlocutory relief in this Court. A return to a more piecemeal and deliberative judicial process may strike some as inefficient. It may promise less power for the judge and less drama and excitement for the parties and public. But if any of that makes today's decision wrong, it makes it wrong in the best possible ways, for "good judicial decisions are usually tempered by older virtues." *DHS*, 589 U. S., at ___ (slip op., at 4).

# SUPREME COURT OF THE UNITED STATES

_____

No. 23A763

_____

RAUL LABRADOR, ATTORNEY GENERAL OF IDAHO
*v.* PAM POE, BY AND THROUGH HER PARENTS AND NEXT
FRIENDS, PENNY AND PETER POE, ET AL.

ON APPLICATION FOR STAY

[April 15, 2024]

JUSTICE KAVANAUGH, with whom JUSTICE BARRETT joins, concurring in the grant of stay.

A Federal District Court in Idaho preliminarily enjoined Idaho from enforcing its new Vulnerable Child Protection Act. The U. S. Court of Appeals for the Ninth Circuit declined to stay the injunction. Idaho then filed an emergency application in this Court for a partial stay of the injunction. The Court today grants Idaho's emergency application. I agree with the Court's decision.

I add this concurring opinion to explain how this Court typically resolves emergency applications in cases like this—namely, in cases where a party has sought to enjoin enforcement of a new state or federal law in the often years-long period until a final decision on the merits.

Traditionally, one important factor when this Court decides an emergency application involving a new law is likelihood of success on the merits. The likelihood of success on the merits factor can pose difficulty, however, because it can require the Court to assess the merits of important cases earlier and more quickly than is ordinarily preferable, and to do so without the benefit of full merits briefing and oral argument. But when resolving emergency applications involving significant new laws, this Court often cannot avoid that difficulty. It is not ideal, but it is reality. Given that reality, the Court must then determine

the best processes for analyzing likelihood of success on the merits in emergency cases.

## I

Here is how the issue typically arises. After a new federal statute, federal regulation, or state law has been enacted, an adversely affected party who contends that the new law violates the Constitution or federal law may seek a pre-enforcement preliminary injunction in federal district court. A preliminary injunction prevents the government from enforcing its new law pending the eventual decision on the merits. If the district court grants a preliminary injunction, the government may promptly seek a stay in the court of appeals. Or if the district court denies a preliminary injunction, the plaintiff may promptly seek an injunction in the court of appeals.

The party that loses in the court of appeals may then seek emergency relief in this Court. The losing party may argue, for example, that a consequential new law has been mistakenly enjoined or mistakenly green-lighted by the lower courts, and ask this Court to grant relief.

When an emergency application comes to this Court, we must decide it—grant or deny. The Court has no authority to reject or turn away emergency filings without deciding them.

It is critical to appreciate the significance of the decision that this Court is being asked to make in emergency cases involving new laws. Keep in mind how much time it takes for the litigation process to run its course and reach a final merits ruling in the district court, court of appeals, and potentially this Court—often one to three years or even longer. The final merits decision, when it occurs, will of course be important. But the interim status of the law— that is, whether the law is enforceable during the several years while the parties wait for a final merits ruling—*itself* raises a separate question of extraordinary significance to

the parties and the American people. And *that* is the question this Court often must address when deciding emergency applications involving new laws.[1]

Consider a few examples. Suppose that a State enacts a new online defamation law. Do communications and media companies have to alter their editorial policies and posting practices to comply with that new speech law during the several years while its constitutionality under the First Amendment is being litigated on the merits? Or suppose that EPA issues major new environmental regulations. Do businesses have to restructure their operations or build new facilities to comply with the new regulations during the multiyear period while the legality of the regulations is being challenged in court? Cf. *West Virginia* v. *EPA*, 577 U. S. 1126 (2016) (enjoining Clean Power Plan pending review by the Court of Appeals and Supreme Court).

In those emergency cases, the plaintiffs—including individuals and businesses—often will suffer irreparable harm if the relevant government officials *are not enjoined* from enforcing the law during that multiyear period. But on the flip side, other parties—including the Federal Government, the States, or other individuals and businesses—often will suffer irreparable harm if the relevant government officials *are enjoined* from enforcing the law during that multiyear period.

If the moving party has not demonstrated irreparable harm, then this Court can avoid delving into the merits. But not infrequently—especially with important new laws—the harms and equities are very weighty on both sides. In those cases, this Court has little choice but to

———————

[1] The Court also receives emergency applications in other contexts, such as capital cases, election-law cases, and a smorgasbord of other matters. But a distinct difficulty arises when we consider emergency applications involving the enforcement of new federal or state laws. This opinion uses "laws" as shorthand to include regulations and executive policies as well.

decide the emergency application by assessing likelihood of success on the merits. Courts historically have relied on likelihood of success as a factor because, if the harms and equities are sufficiently weighty on both sides, the best and fairest way to decide whether to temporarily enjoin a law pending the final decision is to evaluate which party is most likely to prevail in the end.[2]

The merits issues raised in emergency applications involving new laws can be consequential and difficult. And those applications can require this Court to assess the merits on a tight timeline—without the benefit of many reasoned lower-court opinions, full merits briefing, and oral argument. It is worth noting that this difficulty is not unique to this Court—lower courts must also deal with applications for interim relief that can require them to assess the merits on a tight timeline.

That scenario is not always optimal for orderly judicial decisionmaking. So various suggestions have been made to eliminate or reduce the need for this Court to address likelihood of success on the merits when resolving emergency applications involving new laws. Some suggestions have force; others are questionable. As I see it, none completely eliminates the need for this Court to make those calls.

*First*, some suggest that this Court, when receiving an emergency application involving a new law, should adopt a default posture of deference to the court of appeals' ruling on a stay or injunction, especially when the court of appeals

---

[2] This Court has used different formulations of the factors for granting emergency relief. All formulations basically encompass (1) likelihood of success on the merits (or a fair prospect of success); (2) certworthiness; (3) the harms to the parties; and (4) the equities and public interest. See, *e.g.*, *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*). For present purposes, I will treat likelihood of success as equivalent to a fair prospect of success. If there is any meaningful difference among the common formulations of the emergency-relief factors (which I tend to doubt), those distinctions can be explored if necessary in a future case.

has not disturbed the district court's ruling on whether to grant or deny an injunction. See, *e.g.*, *post*, p. 1 (JACKSON, J., dissenting from grant of stay). Under that view, this Court should deny most emergency applications in cases involving new laws, regardless of whether an injunction against enforcement of the law was ultimately upheld or denied by the court of appeals.

I respectfully disagree with that suggestion. Again, whether a new federal or state law can be enforced during the several years before a final ruling on the merits can *itself* be an important national question. And this Court has a responsibility to resolve major questions of national importance. So a default policy of off-loading to lower courts the final word on whether to green-light or block major new laws for the several years until a final ruling on the merits would amount to an abdication of this Court's proper role. Moreover, given the possibility that different courts of appeals might reach different conclusions on whether to enjoin the enforcement of a new law for the several years pending final review, a deferential approach could lead to substantial uncertainty and disuniformity that become untenable in cases involving nationwide government programs or national businesses.

I would therefore not adopt a default position where the Court always (or almost always) denies emergency applications involving new laws. Rather, the Court needs some way to evaluate when to grant relief. And one of the traditional, tried-and-true factors has been likelihood of success on the merits.

*Second*, one might reasonably think that this Court, when dealing with an emergency application, should simply try to "preserve the status quo." Sounds attractive in theory. But in practice, difficulties emerge when trying to define the status quo. Is the status quo the situation on the ground *before* enactment of the new law? Or is the status quo the situation *after* enactment of the new law, but before

any judicial injunction?  Or is the status quo the situation after any district court ruling on a preliminary injunction? Or is the status quo the situation after a court of appeals ruling on a stay or injunction?

There is no good blanket answer to the question of what the status quo is.  Each conception of the status quo is defensible, but there is no sound or principled reason to pick one over another as a rule to apply in all cases involving new laws.

And even if we could settle on one definition of the status quo, applying that one definition consistently across the range of emergency applications would lead to very troubling results.  Suppose, for example, that the status quo is defined to mean the status before enactment of the new law.  If courts applied that rule across the board, some plainly constitutional and democratically enacted laws would effectively be blocked for several years pending the final decision on the merits.  Or suppose instead that the status quo is defined as the status after the new law is in place.  In that case, some plainly unconstitutional or otherwise illegal laws would nonetheless remain in effect and be enforced against individuals and businesses for several years pending the final decision on the merits.

I doubt that anyone would tolerate such an inequitable and scattershot approach.  So even if we could define the status quo in theory in a principled way across all cases, a blanket rule of "preserving the status quo" in application would not be suitable for this Court's emergency docket. That is yet another reason why the Court throughout its history has relied on likelihood of success on the merits as an essential factor in determining when to grant emergency relief in individual cases.

*Third*, JUSTICE BARRETT has emphasized that the Court can and should take care to focus on certworthiness when considering emergency applications.  *Does 1–3* v. *Mills*, 595 U. S. ___ (2021) (BARRETT, J., concurring in denial of

application for injunctive relief ). If the underlying merits issue would not warrant this Court's review when the case returned to the Court on the merits docket, then we should deny the application and leave the question of interim relief to the court of appeals. I fully agree with JUSTICE BARRETT's important insight. Emphasizing certworthiness as a threshold consideration helps to prevent parties from using "the emergency docket to force the Court to give a merits preview in cases that it would be unlikely to take." *Id.*, at \_\_\_ (slip op., at 1).

Of course, the certworthiness factor is, by definition, only a partial cure for the issue here: Although emphasizing that factor reduces the number of emergency applications involving new laws where we have to assess the merits, some of the most significant and difficult emergency applications will readily clear the certworthiness bar. And in those cases, we may still have to assess likelihood of success on the merits.

*Fourth*, some suggest that the Court should prohibit so-called nationwide and statewide injunctions—injunctions that prevent enforcement of a law against persons other than the plaintiffs. The theory is that eliminating nationwide and statewide injunctions by district courts will in turn reduce the number of emergency applications involving new laws that make it to this Court, or at least reduce the number of applications where this Court needs to assess the merits.

As I see it, prohibiting nationwide or statewide injunctions may turn out to be the right rule as a matter of law regardless of its impact on this Court's emergency docket. See *ante,* at 4–5, 13 (GORSUCH, J., concurring in grant of stay). More to the point for present purposes, I agree that such a rule could somewhat reduce the number of emergency applications that make it to this Court and require the Court to assess the merits.

To begin with, the government party might not seek

immediate appellate (or Supreme Court) review of a preliminary injunction that is confined to one or a few individual parties. And an emergency application to this Court where the issue concerns only a few individual parties may not clear the certworthiness bar.[3]

That said, a rule prohibiting nationwide or statewide injunctions would not eliminate the need for this Court to assess the merits of some emergency applications involving new laws. For one, there is ongoing debate about whether any such rule would apply to Administrative Procedure Act cases involving new federal regulations, given the text of the APA. See *Griffin* v. *HM Florida-ORL, LLC*, 601 U. S. ___, ___, n. 1 (2023) (statement of KAVANAUGH, J., respecting denial of application for stay) (slip op., at 3, n. 1); 5 U. S. C. §706(2). But put that caveat aside for now.

Even if a district court enjoins a new federal statute or state law only as to the particular plaintiffs, that injunction could still have widespread effect. For example, the plaintiff might be a State, or the plaintiff might be an association that has many members, or the plaintiffs might file a class action for classwide injunctive relief under Rule 23(b) of the Federal Rules of Civil Procedure. So even if district court injunctions are confined to the plaintiffs, there still will be emergency applications with nationally important effects that come to this Court and clear the certworthiness bar, thereby still requiring this Court to assess the merits.

Moreover, the effects of a rule prohibiting nationwide or statewide injunctions on this Court's emergency docket can be diminished by vertical *stare decisis.* The general discussion of the scope of district court injunctions often overlooks the important role of the court of appeals. Even

_____

[3] The scope of the injunction may affect evaluation not only of certworthiness but also of the harms to the government defendant and other affected parties.

when district court injunctions are limited to the plaintiffs, the losing party in the district court's preliminary injunction proceeding may promptly seek an injunction or stay in the court of appeals. And any ensuing decision by the court of appeals to grant or deny injunctive relief could then have precedential effect—formally, when there is a precedential opinion, or perhaps informally, when there is not—on other district courts in that circuit when other parties seek similar injunctive relief. After all, with any consequential new law, many different parties may seek preliminary injunctions in separate proceedings in the district courts within a circuit.

As a result, the ruling *by the court of appeals* on an emergency application for a stay or injunction in a discrete case (or cases) can often determine whether the new law continues to be enforced across the entire circuit. And in those circumstances, the losing party in the court of appeals may seek relief in this Court and point out that the court of appeals decision may have broader circuitwide impact—and is therefore different from just a single district court ruling involving a few plaintiffs. Put simply, when a court of appeals ruling on an emergency stay or injunction could affect enforcement of a significant new law throughout the circuit, that broader impact may sometimes make the case significant enough to clear the certworthiness bar in this Court.

With any consequential new federal law, moreover, it is likely that different parties will seek preliminary injunctions in multiple circuits. And what happens if different courts of appeals reach different results? For example, what if a major new federal law regulating social media companies, or immigration, or energy producers, or healthcare, or securities markets is enforceable in one circuit but not in another for the several years pending final review on the merits? That disuniformity could often be highly problematic. Again, an emergency application to

this Court in those circumstances could clear the certworthiness bar, meaning that we may still have to consider likelihood of success when deciding it.

In short, a rule limiting the scope of district court injunctions may be correct as a matter of law, even apart from its effects on this Court's emergency docket. And the result of a rule against nationwide or statewide injunctions may be to somewhat reduce the number of emergency applications involving new laws where this Court must assess likelihood of success on the merits. But that rule would not eliminate the need for this Court to sometimes decide important emergency applications involving new laws by assessing likelihood of success on the merits.[4]

II

As the discussion so far has sought to illustrate, this Court cannot avoid evaluation of the merits in at least *some* emergency applications involving consequential new laws.

If I am correct about that basic reality, another important question concerns this Court's processes. What process should this Court employ for assessing likelihood of success on the merits with respect to an emergency application, particularly in cases involving important new federal or state laws? Given the extraordinary significance of the question whether a consequential new law can be enforced during the several years while merits litigation is ongoing, the Court should use as many tools as feasible and appropriate to make the most informed and best decision. Sometimes that might mean taking more time (if available), ordering supplemental briefing, or inviting *amicus* briefs. In certain circumstances, moreover, the Court might benefit from oral argument or may even grant certiorari before judgment.

––––––––––

[4] Here, the State's application seeks a stay primarily because of the scope of the injunction. That issue is itself certworthy, and I believe that the State has a likelihood of success on that issue.

Especially in recent years, the Court has employed many of those tools to help the Court better decide important emergency applications. See, *e.g.*, *Biden* v. *Nebraska*, 600 U. S. 477 (2023) (Court granted certiorari before judgment and expedited oral argument after receiving emergency application involving federal student loan forgiveness program); *National Federation of Independent Business* v. *OSHA*, 595 U. S. 109 (2022) (*per curiam*) (Court granted expedited oral argument after receiving emergency application involving OSHA vaccine mandate); *Biden* v. *Missouri*, 595 U. S. 87 (2022) (*per curiam*) (same, for emergency application involving CMS vaccine mandate). And I believe that the Court should continue to be flexible in employing appropriate procedures so as to best decide important emergency applications.

A related question is whether the Court should issue opinions—that is, opinions for the Court as distinct from separate concurring or dissenting opinions—to publicly explain our grounds for granting or denying an emergency application involving an important new law. Opinions for the Court can sometimes be appropriate in order to explain our reasoning, as in the vaccine mandate cases, for example. See *ibid.*[5] That said, an opinion for the Court addressing likelihood of success on the merits for an emergency application can sometimes come at a cost. A written opinion by this Court assessing likelihood of success on the merits at a preliminary stage can create a lock-in effect because of the opinion's potential vertical

——————

[5] During the COVID–19 pandemic, the Court sometimes found it important to issue opinions on COVID–19-related legal questions, in part because of the widespread assumption that the pandemic would largely be over before any final ruling on the merits in the court system. Therefore, the emergency docket during the COVID–19 pandemic in essence *was* the merits docket as to certain COVID–19-related issues. Not surprisingly, this Court's emergency docket, while still robust, has shrunk in the years since COVID–19.

precedential effect (*de jure* or *de facto*), which can thereby predetermine the case's outcome in the proceedings in the lower courts and hamper percolation across other lower courts on the underlying merits question. (Of course, that can happen to a lesser degree even when the Court simply issues a bare-bones order granting or denying relief.) So in my view, issuing opinions for the Court with respect to emergency applications may sometimes be appropriate, but we should exercise appropriate caution before doing so.

\*    \*    \*

Although the volume of cases challenging new laws and coming to this Court on the emergency docket is a relatively recent development, this Court's emergency docket—and the difficulties associated with it—are not new. The emergency docket has always existed, and both the Court and even individual Justices acting in chambers have made a plethora of important decisions for the Nation in an emergency posture. See, *e.g.*, *West Virginia* v. *EPA*, 577 U. S. 1126 (2016) (temporarily enjoining Clean Power Plan); *Purcell* v. *Gonzalez*, 549 U. S. 1 (2006) (*per curiam*) (vacating injunction pending appeal regarding state voter ID law); *Rubin* v. *United States*, 524 U. S. 1301 (1998) (Rehnquist, C. J., in chambers) (denying stay pending certiorari of order enforcing subpoenas to Secret Service agents regarding observations of the President); *Schlesinger* v. *Holtzman*, 414 U. S. 1321 (1973) (Marshall, J., in chambers) (staying District Court's injunction that ordered a halt to bombing in Cambodia); *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 584, 589 (1952) (after expedited oral argument, affirming District Court's preliminary injunction that proscribed seizure of steel mills by government); cf. *Rosenberg* v. *United States*, 346 U. S. 273, 283–285 (1953) (vacating stay of execution of the Rosenbergs).

In my view, the Court can potentially reduce the number

KAVANAUGH, J., concurring

of emergency applications involving new laws where the Court has to assess likelihood of success on the merits. But this Court is responsible for resolving questions of national importance, even when they arise on the emergency docket. Fulfilling that responsibility will sometimes require us to assess likelihood of success on the merits in emergency cases involving new laws, as the Court has in the past.

# SUPREME COURT OF THE UNITED STATES

_____

No. 23A763

_____

## RAUL LABRADOR, ATTORNEY GENERAL OF IDAHO *v.* PAM POE, BY AND THROUGH HER PARENTS AND NEXT FRIENDS, PENNY AND PETER POE, ET AL.

ON APPLICATION FOR STAY

[April 15, 2024]

JUSTICE JACKSON, with whom JUSTICE SOTOMAYOR joins, dissenting from grant of stay.

When a party asks this Court to "sideste[p] the ordinary judicial process" and intervene at an atypical juncture, our default should be "restraint." *Barr* v. *East Bay Sanctuary Covenant*, 588 U. S. \_\_\_, \_\_\_ (2019) (SOTOMAYOR, J., dissenting from grant of stay) (slip op., at 5). We do not have to address every high-profile case percolating in lower courts, and there are usually many good reasons not to do so. Few applicants can meet our threshold requirement of "an exceptional need for immediate relief," by showing that they will suffer not just substantial harm but an "irreversible injury . . . occurring during the appeals process that cannot be later redressed." *Louisiana* v. *American Rivers*, 596 U. S. \_\_\_, \_\_\_ (2022) (KAGAN, J., dissenting) (slip op., at 2). Even when an applicant establishes that highly unusual line-jumping justification, we still must weigh the serious dangers of making consequential decisions "on a short fuse without benefit of full briefing and oral argument." *Does 1–3* v. *Mills*, 595 U. S. \_\_\_, \_\_\_ (2021) (BARRETT, J., concurring in denial of application for injunctive relief) (slip op., at 1). Without adequate caution, our decisions risk being not only "unreasoned," but unreasonable. *Whole Woman's Health* v. *Jackson*, 594 U. S. \_\_\_, \_\_\_ (2021) (KAGAN, J., dissenting from denial of application for injunctive relief) (slip op., at

1–2).

This case presents numerous reasons for exercising restraint.  As explained in Part I below, the State of Idaho's emergency application asks us to override the decisions of two lower courts based on an issue not clearly implicated and under circumstances where the State does not contest that its law should remain enjoined as likely unconstitutional, at least as applied to the plaintiffs.  As described in Part II, even if today's application actually involved a "universal injunction," the emergency docket would not be the place to address the open and challenging questions that that issue raises.  I respectfully dissent.

I

Three interdependent reasons counsel against our intervention.  First of all, the applicant seeks displacement of the decisions of both "the District Court and . . . a unanimous panel of the Court of Appeals." *Beame* v. *Friends of the Earth*, 434 U. S. 1310, 1312 (1977) (Marshall, J., in chambers).  A Federal District Court determined that a never-before-in-effect Idaho law is likely unconstitutional, and that court issued a preliminary injunction that temporarily blocks the law's enforcement while it considers the merits of the challengers' legal claims.  Wishing to enforce the challenged law during the course of the litigation, the State asked for a stay pending appeal.  But both the District Court and the Ninth Circuit denied that request.  Our respect for lower court judges—no less committed to fulfilling their constitutional duties than we are and much more familiar with the particulars of the case—normally requires an applicant seeking an emergency stay from this Court after two prior denials to carry "an especially heavy burden."  See *Edwards* v. *Hope Medical Group for Women*, 512 U. S.

1301, 1302 (1994) (Scalia, J., in chambers) (internal quotation marks omitted).[1]

Second, the State has not come close to carrying its heavy burden in this case. No party disputes that, assuming all of the other stay factors were met, Idaho needs to show "a reasonable probability that this Court will grant certiorari" in order to obtain an emergency stay. *Maryland* v. *King*, 567 U. S. 1301, 1302 (2012) (ROBERTS, C. J., in chambers) (internal quotation marks omitted); see also Emergency Application for Stay 29–32; Response in Opposition 19–24; Reply Brief 14–15.[2] Idaho maintains that this case is certworthy because it raises the question of whether a district court can issue an injunction that grants relief directed to all potentially impacted nonparties—a so-called "universal injunction." The only problem: That's not what the District Court did here. Far from attempting to grant relief to parties not before it, the District Court expressly stated that,

————————

[1] The concurrence seems perplexed by the idea that lower court decisions about interim relief deserve our respect. See *ante*, at 6–7 (opinion of GORSUCH, J.) (hereinafter concurrence). In its telling, that "upside-down" suggestion leaves this Court either powerless to correct mistakes or hopelessly inconsistent when we do. *Ante,* at 6. But to say that a party bears an especially heavy burden is not to say that burden can never be carried. See *Little* v. *Reclaim Idaho*, 591 U. S. \_\_\_, \_\_\_ (2020) (ROBERTS, C. J., joined by, *inter alios*, GORSUCH, J., concurring in grant of stay) (slip op., at 5) ("No one has overlooked that the State bears an 'especially heavy burden' in justifying a stay pending its appeal to the Ninth Circuit[,] . . . [b]ut in my view that burden has been met"). Even when two lower courts deny relief, an applicant can still prevail in this Court under our traditional emergency stay factors. The heavier burden, though, has long served as a sobering reminder that, after two prior levels of review, interim relief has consistently been deemed unwarranted.

[2] While the concurrence appears to attribute the certworthiness consideration to this dissent, see *ante,* at 7–8, it is standard practice for this Court to assess certworthiness when evaluating an emergency application. See, *e.g.*, *Does 1–3* v. *Mills*, 595 U. S. \_\_\_, \_\_\_ (2021) (BARRETT, J., concurring in denial of application for injunctive relief) (slip op., at 1); *Little*, 591 U. S., at \_\_\_ (slip op., at 2); *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*).

"[i]n the absence of class certification, injunctive relief gen-erally should be limited to the named plaintiffs." ___ F. Supp. 3d ___, ___ (Idaho 2023), App. A to Application for Stay 52. Then, ultimately, the District Court settled on is-suing a statewide preliminary injunction for a party-cen-tered, fact-specific reason: because it found that doing so was necessary to protect the particular plaintiffs before the court, including two minors proceeding under pseudonyms, against action by the State it deemed likely unconstitu-tional. *Id.*, at 53. Any error by the District Court as to the necessity of the preliminary relief it has chosen raises, at best, a factbound question, not a certworthy issue.[3]

Third, and finally, Idaho seeks emergency relief without contesting that its law should be preliminarily enjoined as likely unconstitutional, at least as applied to the plaintiffs before the District Court. See *ante*, at 2–3 (opinion of GORSUCH, J.). The State takes this litigating position while defending a statute that regulates access to gender-affirm-ing medical care for transgender children. That is a serious and consequential matter, which, indeed, raises the profile of this case and the stakes of our intervention, for the law at issue here will have a significant practical impact on eve-ryone it affects. The constitutional questions around this law are significant as well because statutes like this one raise new and complex issues. Unlike in myriad other emergency cases, however, the State is not seeking interim

_____

[3] The concurrence all but ignores this key aspect of the District Court's decision. See *ante*, at 1–3. But even the most ardent critics of "universal injunctions" acknowledge that, in providing relief to the parties before a court, an injunction may incidentally benefit nonparties. See, *e.g.*, *United States* v. *Texas*, 599 U. S. 670, 693 (2023) (GORSUCH, J., concur-ring in judgment); *Trump* v. *Hawaii*, 585 U. S. 667, 717 (2018) (THOMAS, J., concurring). We might ultimately disagree in this case about whether the District Court's determination about the necessary scope of relief to protect the plaintiffs qualifies as an abuse of discretion. See *ante*, at 8, n. 2. But any such debate would not transform the State's case-specific, fact-intensive request for error correction into a certworthy issue.

relief based on any errors by the lower courts with respect to consequential merits questions. Contra, *ante,* at 8–9.

Instead, in a troubling bid for this Court's early intervention, the State asks us to wade into the middle of ongoing lower court proceedings to weigh in on a single query concerning only one aspect of a preliminary determination by the District Court: whether the temporary relief that the District Court has afforded pending its review of the merits sweeps too broadly. In my view, we should resist being conscripted into service when our involvement amounts to micromanaging the lower courts' exercise of their discretionary authority in the midst of active litigation. This Court is not compelled to rise and respond every time an applicant rushes to us with an alleged emergency, and it is especially important for us to refrain from doing so in novel, highly charged, and unsettled circumstances. Here, where the State does not even seek relief from the District Court's determination that the law is likely unconstitutional as to at least some of the individuals it will impact, caution is especially warranted.

## II

JUSTICE GORSUCH's concurrence demonstrates the perils of treating this application any other way. Conspicuously minimized in that opinion is the word that appears, bolded and capitalized, on the cover of the State's application: "**EMERGENCY**." The concurrence proceeds, instead, to treat the State's application as a run-of-the-mill motion for interim relief, just as any court might dispose of such a motion on its regular docket. See *ante*, at 3. From the standpoint of an interest in taming our emergency docket, that is folly.[4]

—————

[4] This is not to say that the traditional stay factors do not matter, or that this Court can only entertain an application that is labeled as an "emergency." See *ante,* at 9–10, n. 3. Rather, my point is that not every

What is more, in resolving this particular application, the concurrence reaches out to address an unsettled remedial issue that, by the concurrence's own assessment, is of profound significance for the functioning of our government. See *ante*, at 11. It appears, then, that if the concurrence is right that "universal injunctions . . . 'tend to force judges into making rushed, high-stakes, low-information decisions,'" the majority has taken the bait. *Ante*, at 12.

To be clear, though, the Court has not decided the propriety of "universal injunctions." Whether federal courts have the power to issue "universal injunctions" is "an important question that could warrant our review in the future," not a foregone conclusion dictated by our precedent. *Griffin* v. *HM Florida-ORL, LLC*, 601 U. S. ___, ___ (2023) (KAVANAUGH, J., statement respecting denial of application for stay) (slip op., at 3); see also, *e.g.*, *Department of Homeland Security* v. *New York*, 589 U. S. ___, ___ (2020) (GORSUCH, J., concurring in grant of stay) (slip op., at 5) (framing "underlying equitable and constitutional questions raised by . . . nationwide injunctions" as ones "we might at an appropriate juncture take up"). After today, that question remains.

Nor does history offer an easily discernible answer. As one leading scholar candidly admits, "traditional equity lacked the sharply defined rule" that the concurrence would claim the Court adopted today. S. Bray, Multiple Chancellors: Reforming the National Injunction, 131 Harv. L. Rev. 417, 421 (2017). And other leading scholars are actively debating what lessons can be gleaned from the historical record. See A. Frost, In Defense of Nationwide Injunctions, 93 N. Y. U. L. Rev. 1065, 1080–1090 (2018) (offering an account of "universal injunctions" consistent with Article III

———————

alleged error made by a lower court judge warrants this Court's immediate intervention and correction in real time, while the lower court's proceedings are pending.

and American courts' traditional equitable powers); see also M. Sohoni, The Lost History of the "Universal" Injunction, 133 Harv. L. Rev. 920, 1008 (2020) (expressing concern that, in debate over the limits of federal courts' equitable powers, "we risk allowing selectively crafted conceptions of historical tradition to run away with us").

Simply put, the questions raised by "universal injunctions" are contested and difficult. I would not attempt to take them on in this emergency posture, even in a case that actually raised the issue. We do not have full adversarial briefing, the benefits of oral argument, or even a final opinion from the Court of Appeals. To the extent we can draw any lesson from the lower courts at this point, it is that, "when faced with laws very much like Idaho's," determining the appropriate bounds of equitable relief and the propriety of "universal injunctions" is not straightforward. *Ante*, at 7 (citing *Brandt* v. *Rutledge*, 47 F. 4th 661, 672 (CA8 2022); *L. W.* v. *Skrmetti*, 83 F. 4th 460, 489–490 (CA6 2023)).

\*　　\*　　\*

All that said, I see some common ground. I agree that our emergency docket seems to have become increasingly unworkable. See *ante*, at 10. I share the concern that courts heed the limits of their power. See *ante,* at 12. And surely all could benefit from "more carefully reasoned judicial decisions attuned to the facts, parties, and claims at hand," not to mention "a more . . . deliberative judicial process." *Ante,* at 12–13. With respect, though, I worry that we may be too eager to find fault in everyone but ourselves.

This Court will almost certainly have a chance to consider the entirety of this case soon, whoever prevails below. In the meantime, it is far better for all concerned to let the lower courts proceed unfettered by our intervention. We can, and usually should, wait to provide our assessment in the ordinary course—when it is our turn to do so. Put differently, whenever this Court must determine whether to

exercise its discretionary power to intervene in pending cases on an emergency basis, I firmly believe we must proceed with both reason and restraint.  Because the majority demonstrates neither today, I respectfully dissent.